**<u>NOT FOR PUBLICATION</u>**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

Order Filed on August 13, 2021
by Clerk,
U.S. Bankruptcy Court
District of New Jersey

|  |  |  |  |
|---|---|---|---|
| In re: | : | | |
| | : | CHAPTER 7 | |
| CHIVY NGO, | : | | |
|         Debtor. | : | CASE NO.: | 19-21816 (SLM) |
| ——————————————— | : | | |
| HUN CHI NGO, | : | | |
|         Plaintiff, | : | ADV. NO.: | 19-02145 (SLM) |
| v. | : | | |
| CHIVY NGO, | : | | |
|         Defendant. | : | | |
| ——————————————— | : | | |
| CHARLES M. FORMAN, | : | | |
| as Chapter 7 Trustee for Chivy Ngo, | : | ADV. NO.: | 19-02161 (SLM) |
|         Plaintiff, | : | | |
| v. | : | | |
| CHIVY NGO and KIMBERLY | : | | |
| PHUNG NGO, | : | | |
|         Defendants. | : | | |
| ——————————————— | : | | |
| CHARLES M. FORMAN, | : | | |
| as Chapter 7 Trustee, | : | | |
|         Plaintiff, | : | ADV. NO.: | 20-01196 (SLM) |
| v. | : | | |
| CHIVY NGO, | : | | |
|         Defendant. | : | | |
| ——————————————— | : | | |

# **O P I N I O N**

## **APPEARANCES**

BRUCE H. LEVITT, ESQ.
Levitt & Slafkes, P.C.
515 Valley Street, Suite 140
Maplewood, NJ 07040
*Attorneys for the Plaintiff, Hun Chi Ngo*

ERIC J. KENNEDY, ESQ.
Forman Holt, Attorneys at Law
365 W. Passaic Street, Suite 400
Rochelle Park, NJ 07662
*Attorneys for the Plaintiff, Chapter 7 Trustee,*
*Charles M. Forman*

CHIVY NGO
6 Malanga Court
Scotch Plains, NJ 07076
*Pro Se, Chapter 7 Debtor*

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

## <u>INTRODUCTION</u>

On June 13, 2019, Chivy Ngo (the "**Defendant**") filed a voluntary petition under Chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**").  Subsequently, three adversary proceedings were filed against the Defendant and others.  The Chapter 7 Trustee, Charles Forman (the "**Trustee**") filed two adversary proceedings—one for turnover against the Defendant and his non-filing spouse, Kimberly Phung Ngo ("**Defendant Kimberly**") (collectively with Defendant, the "**Defendants**"), and one objecting to discharge pursuant to section 727 of the Bankruptcy Code.  The Defendant's brother, Hun Chi Ngo (the "**Brother**"), also filed an adversary proceeding seeking denial of Defendant's discharge pursuant to multiple provisions under section 727(a) and sections 523(a)(4) and (6) of the Bankruptcy Code.  All three adversary proceedings were administratively consolidated for the sake of judicial economy.  The Trustee and Brother (collectively the "**Plaintiffs**") generally rely upon the same facts and circumstances.

The Court reviewed the pleadings submitted and held a trial spanning multiple days.  At the conclusion of the trial, the Court requested that the parties submit proposed findings of fact and conclusions of law.  The Plaintiffs submitted them, and the Defendants did not.  It is not surprising that Defendant Kimberly failed to submit anything because Defendant Kimberly defaulted on the adversary proceeding in which she is a party and did not appear at trial.  For the adversary proceeding wherein Defendant Kimberly is a named party, neither Defendant nor Defendant Kimberly filed answers to the Trustee's Amended Complaint.  As such, the Court entered a default against Defendant Kimberly on June 19, 2020.  *See Adv. Pro. No. 19-02161,* ECF No. 27.

The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 and amended September 18, 2012. This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J), as it involves objections to discharge. Venue is proper under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

This case arises primarily from a financial dispute between brothers. The case is well-known to the Court. From beginning to end, this case has dealt with several issues stemming from the Court issuing orders to show cause to permit the Trustee access to the Defendants' home and safe deposit boxes to seize undisclosed assets, to the Defendant firing his attorney on the first day of trial. From that description, it is clear that the case yielded many surprises. However, the Court's decision should surprise no one.

### *Prior to Trial*

Upon filing for bankruptcy, the Defendant filed a voluntary petition (the "**Petition**") and provided certain information in the form of schedules (the "**Schedules**") and answers to the questions on the *Statement of Financial Affairs* (the "**SOFA**"). *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's[1] Exhibit 1*, P027. The Defendant signed the Petition, Schedules, and SOFA under

---

[1] For purposes of exhibit citations only, the Brother will be referred to as Plaintiff, as that was the description used by the parties at trial. The Trustee will be referred to as the ("Trustee"). The Brother's exhibits were described at trial as "Plaintiff's Exhibit ___." The Trustee's exhibits were described as "Trustee's Exhibit ___." In the citations, the exhibits will be referred to as Plaintiff's and Trustee's, respectively. The text will use the defined terms—Brother, Trustee, and Plaintiffs.

penalty of perjury. *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's Exhibit 1*, P033. On Schedule A/B of the Defendant's petition, he lists his residence as 6 Malanga Court, Scotch Plains, NJ (the "**Residence**"). He also lists: three vehicles; cash on hand of $3,500.00; one bank account at Chase Bank with a balance of $200.00; and a lawsuit for claims against the Brother in the amount of $303,700.00. Scheduled A/B identified no other assets. *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's Exhibit 1*, P010–P015. Further, Schedule G identifies no contracts or unexpired leases. *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's Exhibit 1*, P021. Schedule I indicates that Defendant is a "store employee" of East Dumpling, Inc. and earns $2,000.00 per month. It also indicates that the Defendant's spouse is "self-employed" earning $1,000.00 per month. Schedule I discloses no other income. *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's Exhibit 1*, P023-P024. Schedule J shows the Defendant's expenses total $3,905.00 but does not show any mortgage or rent payments. *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's Exhibit 1,* P025-026. The Defendant additionally answers "no" to every question in his SOFA, except questions six and sixteen. The Defendant answers question six in the affirmative as to whether his debts are primarily consumer debts. For question sixteen, the Defendant identifies a "0" payment to Vincent S. Wong for services rendered in connection with the bankruptcy proceeding. *Main Bankruptcy Case*, ECF No. 1; *Plaintiff's Exhibit 1*, P028-P033. Eventually, the Defendant filed amended schedules on January 7, 2021, but only after the Trustee already discovered several undisclosed assets. *Main Bankruptcy Case*, ECF Nos. 87 and 88.

Both Defendants filed certifications under penalty of perjury in response to the complaint. Defendant Kimberly filed a certification dated October 3, 2019 ("**Defendant Kimberly's Certification**"). *Adv. Pro. No. 19-02145*, ECF No. 4; *see also Defendant Kimberly's Certification*, *Trustee's Exhibit 3*, T00022-T00026. The Defendant filed a certification dated October 3, 2019

("**Defendant's Certification**").  *Adv. Pro. No. 19-02145*, ECF No. 3; *see also Defendant's Certification, Trustee's Exhibit 2*, T00014-T00021.  Neither Defendant nor Defendant Kimberly filed an answer to the Trustee's Amended Complaint in Adversary Proceeding No. 19-02161, or any document denying the allegations in the Amended Complaint.  The Court entered default against Defendant Kimberly on June 19, 2020.  *Adv. Pro. No. 19-02161*, ECF No. 27.

The Defendant provided sworn testimony about his assets in another proceeding less than one month before he filed bankruptcy.  The Brother provided information to the Trustee to help the Trustee find undisclosed assets.  For instance, the Brother provided the Trustee with information about the undisclosed insurance policies and safe deposit boxes.  The Brother also brought the Trustee's attention to the prior deposition of the Defendant dated May 20, 2019, less than one month before Defendant filed his petition.  In that deposition and just prior to filing bankruptcy, the Defendant testified that he owned life insurance policies and safe deposit boxes. *Trustee's Exhibit 6*, T00087-T00089.  In the May 2019 deposition, the Defendant stated that he earned income of $67,500.00 in 2017 and either $10,000.00 or $18,000.00 in 2018.  *Trustee's Exhibit 6,* T00074 & T00083.  In the May 2019 deposition, the Defendant also testified that he rents an apartment on Elizabeth Street in New York, NY.  T00072.  The Defendant was also asked during the deposition whether he owned any other assets that were not discussed.  He answered "no." *Trustee's Exhibit 6,* T00092.

### *The Brother's Pre-Bankruptcy Judgment*

The dispute between the Brother and the Defendant stems from a commercial real estate transaction, which involves their jointly owned company.  The Brother owns a 49% interest in an entity known as New Angle Realty Corporation ("**New Angle**"), and the Defendant holds a 51%

interest.[2] *Plaintiff's Exhibit 5*, P195.  New Angle owned real property located at 69 Clinton Street, New York, New York (the "**Clinton Street Property**").  *Plaintiff's Exhibit 5*, P195.  On January 14, 2014 the Defendant caused the Clinton Street Property to be sold and paid none of the sale proceeds to the Brother.

In May 2016, the Brother commenced litigation against the Defendant in the Supreme Court of New York, titled *Ngo v. Ngo*, Index No. 154173/2016 (the "**State Court Lawsuit**"). *Plaintiff's Exhibit 4*, P183-P188.  In the State Court Lawsuit the Brother alleged, among other things, that the Defendant: (1) fraudulently misrepresented that the Brother consented to the sale of the Clinton Street Property; (2) converted the Brother's share of the proceeds by retaining those proceeds; and (3) failed to pay any of the proceeds of sale to the Brother.  *Plaintiff's Exhibit 4*, P183-P188.  After a bench trial held on November 30, 2018, in which the Defendant participated, the Honorable Lucy Billings, J.S.C., made numerous factual findings and conclusions of law. Specifically, Judge Billings made the following findings:

- The Brother was the 49% owner of the Clinton Street property.

- The Clinton Street property was sold for $3.5 million, and it had a net yearly income of $208,403.72.

- The Defendant never produced the closing statement or proof of any expenses associated with the sale.

- The Defendant "admitted that he is not always truthful; he admitted to making false representations to his buyer and there is no reason for [the New York Supreme Court] to find that he told the truth while testifying."

- "From the credible proofs presented at trial regarding the sale of 69 Clinton Street, the court finds that the property was sold for $3,500,000 and had a net income of $208,403.72 per year, or $17,366.98 per month[,]" and "[the Brother] is entitled to 49% a net profit from May 18, 2013 until the date of sale, January 14, 2014. That

---

[2] It is unclear to the Court—and irrelevant—whether New Angle still exists.  The Court writes as if New Angle still exists, but the corporate status in no way impacts the Court's decision.

is 7 months x $17,366.98 x 0.49 = $59,568.74. Therefore, [the Brother] is entitled to $1,774,568.74."

- The Brother is also entitled to $793,742.72 in statutory interest from January 14, 2014 to the date of the judgment.

- The total judgment amount is $2,568,311.46.

*Plaintiff's Exhibit 5*, P189-P202; Trial Testimony of Hun Chi Ngo.

The Defendant unsuccessfully appealed the New York Supreme Court's decision, which was ultimately affirmed on appeal. During the trial in this case, the Brother reiterated his position from the State Court Lawsuit and testified that: (1) he is the 49% owner of New Angle, which was the owner of the Clinton Street Property; (2) the Clinton Street Property was sold without the Brother's consent; (3) the sale proceeds were $3.5 million dollars; (4) the Defendant failed to produce the closing statement or proof of any expenses associated with the sale during the State Court Lawsuit; (5) the amount of the Brother's judgment against the Defendant is $2,568,311.46 (the "**Judgment**"); and (6) the appellate court affirmed the New York Supreme Court's decision.

### ***Prior Relevant Orders from this Court***

Based on the Defendant's testimony in the May 2019 deposition demonstrating undisclosed assets, the Trustee sought and obtained an order under seal from this Court permitting him to enter the Residence to search for concealed assets. *Main Bankruptcy Case*, ECF No. 18. The United States Marshals Service accompanied the Trustee. The Trustee recovered assets from the Residence in a seizure that took place on September 27, 2019.

The Trustee also filed a *Motion to Compel Access to Safe Deposit Boxes and Information*, which the Court granted in an Order dated October 29, 2019. *Main Bankruptcy Case*, ECF No. 37. The Trustee recovered more undisclosed assets from the safe deposit boxes.

As a result of the Trustee's seizure of the undisclosed assets, Defendant Kimberly and the Trustee engaged in discussions as to whether Defendant Kimberly possessed any interest in those assets.  Ultimately, the Trustee paid $50,000.00 to Defendant Kimberly pursuant to the *Consent Order Regarding Seized Funds* entered October 7, 2019 and the *Second Consent Order Regarding Seized Funds* entered on November 25, 2020.  *Main Bankruptcy Case*, ECF Nos. 24 and 81.

### *The Defendant's Trial*

On March 12, 2021 at 10:00 a.m., the Court commenced a trial in the consolidated proceedings.  The trial was conducted via Zoom.  For each day of trial, the following people were present: (1) the Trustee and his counsel; (2) the Brother and his counsel; and (3) the Defendant. The Defendant's prior counsel (Vincent S. Wong, Esq.) was present until the Defendant fired him, which occurred the very first day of trial.  The Trustee's appraiser, Alan Atkins from A. Atkins Appraisal Corp, Alan Atkins (the "**Appraiser**") also appeared on certain days of the trial.

### *The Defendant Fires His Counsel*

The Court permitted opening statements, but only the Defendant elected to give one.  Mr. Wong, appearing for the Defendant, gave an opening statement.  Immediately thereafter, the Defendant without any warning to the Court whatsoever, fired Mr. Wong on the record.  The Defendant alleged that Mr. Wong failed to properly represent the Defendant's best interest and was incompetent.  The Defendant and Mr. Wong advised the Court that Mr. Wong previously provided a copy of the Defendant's files to the Defendant some time ago.  They both agreed the Defendant reviewed the files and apparently the topic of the Defendant hiring a new attorney was discussed between them.  However, prior to trial, the Defendant did not terminate Mr. Wong nor hire a new attorney.  Therefore, Mr. Wong appeared at trial on the first day representing the Defendant.

Once the Defendant terminated Mr. Wong at the trial, Mr. Wong made an immediate oral motion to withdraw as counsel for the Defendant.  No one objected to that motion.  The Court granted the motion to withdraw.  Mr. Wong then requested the Court adjourn the trial to permit the Defendant to obtain new counsel.  After hearing the parties' arguments regarding the Defendant's adjournment request, the Court adjourned the trial to March 15, 2021 at 9:30 a.m. with instructions to the Defendant to retain new counsel.  In addition, the Court gave an oral decision relieving Mr. Wong as attorney for the Defendant.  The Court memorialized the bench ruling in an order dated March 12, 2021.  *Adv. Pro. No. 19-02145*, ECF No. 27.

### ***Second Day of Trial***

The trial continued on March 15, 2021 at 9:30 a.m.  The Plaintiffs put forth their case in chief.  The following witnesses testified on behalf of the Plaintiffs: (1) the Trustee; (2) the Brother; and (3) the Appraiser.  The Brother's counsel then sought to question the Defendant.  However, the Defendant initially failed to participle or cooperate at all.  The Defendant refused to be sworn in or take the stand and answer any questions posed to him.  The Court eventually administered the oath to the Defendant.  But immediately thereafter, when the Brother's counsel asked the Defendant questions, the Defendant refused to answer.  The Brother's counsel asked and received permission to consider the Defendant as a hostile witness.  Instead of cooperating, the Defendant made a statement that the Court was treating him unfairly because of his lack of representation. The Defendant asserted it is unconstitutional to require him to continue without counsel.  The Defendant explained to the Court that he did not understand the proceedings and was mentally incapable of digesting the legal proceeding.  The Court engaged in a discussion with the Defendant to make sure the "lack of understanding" was related to the Defendant's lack of legal knowledge and nothing else.  After discussion, the Court found it acceptable to continue.

The Court notes that the Defendant was a savvy businessman handling at least one transaction worth millions of dollars. The Defendant already actively participated in the State Court Lawsuit. Further, the Defendant had counsel right up to the beginning of trial. The Defendant had already participated in settlement negotiations and attended various bankruptcy court proceedings with his former counsel prior to the trial. Accordingly, the Court finds that the Defendant lacks credibility in stating that he did not understand the legal proceedings. While the Defendant may not have anticipated that the proceedings would continue in spite of his shenanigans on day one of the trial, the Court has no doubt that the Defendant fully understood what the trial was about and what was at stake.

Both the Brother's counsel and the Trustee's counsel made oral motions to strike the Defendant's answers because he failed to answer any questions posed to him while appearing as a witness. The Court adjourned the trial to consider the oral motions to strike, and to again give the Defendant an opportunity to obtain substitute counsel. The Court adjourned the trial to March 17, 2021 at 9:30 a.m.

### ***Third Day of Trial***

The trial resumed on March 17, 2021 at 9:30 a.m. The Defendant again appeared without counsel. The Defendant indicated he was still unable to retain counsel. The Court resumed the proceedings. The Court began by denying the oral motions to strike, reasoning that the Trustee and the Brother still needed to present evidence to prove their case regardless of whether the Defendant chose to actively participate in the trial. After further consideration of the Defendant's situation—albeit one of his own making—the Court again adjourned the trial, this time for two weeks. The Court advised the Defendant that it was the last adjournment and he needed to use the time to retain counsel, if that is what he chose to do. The Court explained to the Trustee and the

11

Brother that a continuance of two weeks would cause no prejudice to them.  The Court advised

that the trial would resume on March 31, 2021.

### *Fourth Day of Trial*

The trial continued on March 31, 2021 at 9:30 a.m.  The Defendant once again failed to

appear with counsel.  The Defendant again indicated that he was unable to retain counsel.  The

Court advised the parties that the trial would proceed, which it did.  The court inquired of the

Defendant as to whether he wished to present his case.  The Defendant refused to participate.  The

Court concluded the trial.  At the conclusion of trial, the Court requested findings of fact and

conclusions of law.  The Plaintiffs submitted them.  During the trial, the Trustee and the Brother

split the presentation of Plaintiffs' evidence.  The Court will now summarize the evidence

presented at trial.

### *Trustee's Testimony/Evidence*

The Trustee's testimony focuses on undisclosed assets comprised of whole life insurance

policies, safe deposit boxes containing valuables including cash and jewelry, and other cash and

valuables found at the Residence.  The Trustee alleges the Defendant failed to disclose:  whole life

insurance policies from New York Life and MetLife with total cash values of $174,860.45; and

three safe deposit boxes containing cash, jewelry, and gold with a total value of $69,740.00.  The

Trustee states the Defendant failed to list the whole life insurance policies on his schedules.

*Trustee's Exhibits 7, 8, 9 and 10*, T00124-T00229.  The Trustee also asserts the Defendant failed

to include any safe deposit boxes on his SOFA.  *See Trustee's Exhibit 11*, T00230; *Appraisal*

*Report* dated November 26, 2019; *Trustee's Exhibit 5*, T00056 -T00070.

The Trustee testified he discovered the existence of the undisclosed insurance policies and

safe deposit boxes because the Brother gave him the transcript of the Defendant's May 2019

testimony. Specifically, the deposition occurred on May 20, 2019, less than a month before the

Defendant filed his bankruptcy petition. In the May 20, 2019 deposition, the Defendant testified

that he owned life insurance policies and safe deposit boxes. *Trustee's Exhibit 6*, T00087-T00089.

The Trustee testified to numerous assets that the Defendant failed to disclose on his

schedules and SOFA. *Trustee's Exhibit 6*, T00071-T00123. The Trustee identified the non-

disclosed assets (which existed as of the May 20, 2019 deposition) such as:

- the Defendant's ownership interest in four restaurants—East Dumpling, Inc., Grand Boky, Mr. Boky, New Boky. *Trustee's Exhibit 6*, T00075, T00087, T00091.

- brokerage accounts with TD Ameritrade and Cathay Broker. *Trustee's Exhibit 6*, T00084.

- three safe deposit boxes in the Defendant's name. *Trustee's Exhibit 6*, T00084.

- a loan repayment due to the Defendant from the Defendant's sister in the amount of $30,000.00. *Trustee's Exhibit 6*, T00085.

- whole life insurance policies with New York Life and MetLife. *Trustee's Exhibit 6*, T00089.

- a smart phone. *Trustee's Exhibit 6*, T00090.

- $25,000.00 cash in a shoe box. *Trustee's Exhibit 6*, T00097.

During the trial, the Trustee testified that he located and gained access to the three safe

deposit boxes that were identified during the May 2019 deposition. The safe deposit boxes were

located at East West Bank and TD Bank. The Trustee recovered undisclosed cash, jewelry, and

gold bars from those safe deposit boxes. *Trustee's Exhibit 11*, T00230. The safe deposit boxes

contained assets valued as follows: Cash – $26,200.00; Gold Bars – $32,850.00; and Jewelry –

$10,690.00. *See Trustee's Exhibit 4,* T00027-T00055. The Trustee further testified that the East

West Bank safe deposit box was held in the names of both the Defendant and Defendant Kimberly.

*See Trustee's Exhibit 11*, T00230.  The Trustee additionally recovered $5,200.00 from the TD Bank safe deposit box, which was held in the Defendant's name alone.

Besides the recoveries from the safe deposit boxes, the Trustee received the cash surrender value of the Defendant's life insurance policies in the amounts of: MetLife 117AR – $130,676.14It[3]; New York Life 947 – $31,068.01; and New York Life 217 – $13,116.30.  *Trustee's Exhibit 8*, T00194-T00195; *Trustee's Exhibit 10*, T00226-T00229.

The Trustee also recovered the seized assets from the Residence.  The Defendant listed none of the seized assets on his schedules.  The Trustee testified that he recovered foreign currency from the Residence, which he estimated to have a value of $1,010.67.  The Trustee testified regarding the locations in the Residence where he found the seized assets.  The Trustee stated he found cash in the basement and in the master bedroom of the Residence, including in the walk-in closet.  Further, some cash was found in a file cabinet that was partially locked.  More cash was found in a locked safe.  The cash in the basement was in a bag above an air duct.  The Trustee found jewelry in the master bedroom.  Most of the jewelry was in a file cabinet that was partially locked.  The Trustee found numerous cameras and equipment throughout the Residence, but primarily in closets.  The Trustee testified that none of the assets appeared to be under the exclusive control of the Defendant or Defendant Kimberly.

The Trustee testified that the Defendant failed to produce any books or records regarding his financial affairs, including records related to business leases, sale of properties, life insurance policies, bank accounts, and amounts owed to the Defendant.  Additionally, the Trustee testified that he and his professionals requested records from the Defendant, which the Defendant never produced, including documents regarding the Defendant's life insurance policies, bank accounts,

---

[3] There was an additional check from Metlife written out to Olivia Amelia Ngo for $9,533.79 that the Trustee does not include in his calculations.

and leases, as well as information about the Defendant's interest in his mother's estate and money

owed to the Defendant by others.  The Defendant failed to question or refute any of the Trustee's

testimony, although the Defendant was present at the trial and heard all of it.

### *Appraiser's Testimony*

The Appraiser appraised the undisclosed assets seized by the Trustee.  The Appraiser

submitted the Appraisal Report dated October 11, 2019 ("**Appraisal Report**").  *Appraisal Report,*

*Trustee's Exhibit 4*, T00027-T00055.  The Appraiser testified he valued the assets as follows:

- cash totaling $153,559.33;

- 23 gold bars valued at $31,000.00;

- jewelry valued at $76,878.00;

- camera equipment valued at $15,796.00; and

- an Apple computer valued at $150.00.

The Appraiser testified that he performed a second appraisal after the Trustee recovered

more assets in another safe deposit box.  The East West Bank safe deposit box assets are identified

and valued by Appraiser as set forth in a supplemental Appraisal Report dated November 26, 2019

("**Supplemental Appraisal Report**").  *See Supplemental Appraisal Report, Trustee's Exhibit 5*,

T00056-T00070.  The assets included in the Supplemental Appraisal Report were gold bars and

jewelry valued at a total of $43,540.00.  *Trustee's Exhibit 5*, T00069.

### *The Brother's Testimony/Evidence*

The Brother testified that he commenced the State Court Lawsuit in May 2016.  *Plaintiff's*

*Exhibit 4*, P183-P188.  The Brother testified the state court complaint alleged, among other things,

that the Defendant: (1) fraudulently misrepresented that the Brother consented to the sale of the

Clinton Street Property; (2) converted the Brother's share of the proceeds by retaining those

proceeds; and (3) failed to pay the Brother.  *Plaintiff's Exhibit 4*, P183-P188.  After a bench trial in state court, the Brother received the Judgment.  The Brother testified that he has not received any payments towards the Judgment.

The Defendant failed to question or refute any of the Brother's testimony, although the Defendant was present at the trial and heard all of it.

### *Defendant's Testimony/Evidence*

The Defendant refused to testify or participate in the trial.  The Defendant also never plead the Fifth Amendment.  Instead when questioned, the Defendant either sat in silence or indicated he would not answer the question posed to him.  The Brother's counsel undertook the job of questioning the Defendant.

When the Brother's counsel questioned the Defendant about the omission of assets from the schedules and SOFA, Defendant failed to answer.  When the Brother's counsel questioned the Defendant about statements from a Bank of America account that the Defendant failed to identify on his Schedules or SOFA, the Defendant again refused to answer.  *Trustee's Exhibit 13*, T00259-T00280.  Further, the Brother's counsel asked Defendant about rent payments that Defendant failed to disclose in Schedule H or Schedule J, again, the Defendant refused to answer.  To be clear, the Defendant refused to answer all questions asked of him by the Brother's counsel.

### DISCUSSION

Plaintiffs carry the burden of proof as to all allegations of the Complaints and must prove their cases by a preponderance of evidence.  *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

In examining the evidence presented, the Court also considers the Defendant's knowing and conscious decision to remain silent.  While the Defendant never plead the Fifth Amendment, cases that consider a defendant remaining silent while pleading the Fifth Amendment provide

16

guidance to this Court.  Those cases deal with the invocation of a constitutional right and this case is one where the Defendant simply refused to participate.  A court may make an adverse inference based on defendant's refusal to answer questions under oath at trial.  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (an adverse inference may be made in certain circumstances even when the witness asserts the Fifth Amendment privilege against self-incrimination); *see also, In re Vrusho*, 321 B.R. 607, 612 (Bankr. D.N.H. 2005) (negative inference permitted in objection to discharge proceeding when witness invoked Fifth Amendment privilege).  Here, the Defendant either failed to answer questions posed to him by remaining silent or stated that he refused to answer.  Relying on the proposition that a court may draw a negative inference even when a defendant invokes the Fifth Amendment privilege, this Court finds that a negative inference is appropriate when a defendant simply chooses not to testify, which is the case here.  The Defendant attended every day of the trial.  He heard various witnesses testify.  When called to the stand as a witness (ultimately categorized as adverse), he either deliberately remained silent or when prodded by the Court stated that he refused to testify.  The Court advised the Defendant that he could face adverse consequences based on his refusal to testify.  Yet, the Defendant remained steadfast in his refusal.  As a result, the Court makes an adverse inference to all questions the Defendant refused to answer.

## A.    *Section 727(a)*

The Plaintiffs seek to deny the Defendant's discharge under multiple provisions of section 727(a) of the Bankruptcy Code.  *See e.g.,* 11 U.S.C. §§ 727(a)(2), (3) and (4).

A discharge under section 727 is "the primary tool used to afford debtors a fresh start[,]" and "Congress has described the discharge as the 'heart' of bankruptcy law's fresh start provisions."  *In re Grammenos*, 469 B.R. 535, 546 (Bankr. D.N.J. 2012) (Gambardella, J.) (quoting *Bielan, Miklos & Makrogiannis v. Vasquez*, No. 08-1409 (DHS), 2010 WL 1644175, at *2 (Bankr.

D.N.J. Apr. 21, 2010) (Steckroth, J.)) (further citations omitted).  Any "[o]bjections to discharge under section 727(a) are liberally construed in favor of the debtor and strictly construed against the objector." *In re Drossel*, No. 06-21154 (DHS), 2009 WL 3230794, at *4 (Bankr. D.N.J. Oct. 1, 2009) (Steckroth, J.) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1533 (3d Cir. 1993); *In re Yanni*, 354 B.R. 708, 712 (Bankr. E.D. Pa. 2006)).  Accordingly, "[c]ourts will deny a discharge only in extreme circumstances." *Grammenos*, 469 B.R. at 546 (quoting *Vasquez*, 2010 WL 1644175, at *2) (further citations omitted).  Further, Federal Rule of Bankruptcy Procedure 4005 provides that "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."  *Grammenos*, 469 B.R. at 546 (quoting Fed. R. Bankr. P. 4005).  However, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. at 279.  Thus, "to receive a discharge, debtors must provide an accurate picture of their pre-petition financial affairs." *Grammenos*, 469 B.R. at 546 (quoting *Vasquez*, 2010 WL 1644175, at *2) (further citations omitted).

### ***Defendant's Discharge is Denied Under Section 727(a)(2)(A)***

Section 727(a)(2)(A) provides

> (a) The court shall grant the debtor a discharge, unless—
>                                         . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition

11 U.S.C. § 727(a)(2)(A).

A discharge will be denied under section 727(a)(2)(A) upon a showing of "an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder,

18

delay, or defraud a creditor)." *Rosen v. Bezner,* 996 F.2d at 1531. Therefore, a plaintiff must show that the debtor "(1) transferred or concealed property; (2) belonging to him; (3) within one year of the bankruptcy filing or after the petition was filed; and (4) with intent to hinder, delay, or defraud a creditor." *In re DiLoreto,* 266 Fed. Appx. 140, 144 (3d Cir. 2008) (citing *In re Dawley,* 312 B.R. 765, 782 (Bankr. E.D. Pa. 2004)). The debtor's "intent must be an actual intent and cannot be constructive." *In re Last,* 440 B.R. 642, 649 (Bankr. D.N.J. 2010) (citing *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002); *In re Adlman,* 541 F.2d 999, 1003 (2d Cir. 1976)) (further citations omitted). The debtor's "intent may be established by circumstantial evidence or inferred from a debtor's conduct." *Last,* 440 B.R. at 649 (citing *Scimeca v. Umanoff,* 169 B.R. 536, 542-43 (D.N.J. 1993)) (further citations omitted).

Here, the Plaintiffs meet each of the elements necessary to deny discharge under section 727(a)(2). Based on the evidence presented and the inferences drawn from the Defendant's failure to answer questions or defend himself, the Court finds that: the Defendant concealed assets from the Court and his creditors, Defendant owned or partially owned the undisclosed assets, and the concealment of the undisclosed assets was within one year after the bankruptcy filing. The evidence clearly demonstrates that the Defendant failed to disclose all of his assets in his bankruptcy case. Specifically, the Defendant failed to disclose: gold bars; cash; jewelry; photographic equipment; safe deposit boxes; insurance policies; brokerage accounts; interests in businesses; and funds owed to him by his sister. The Trustee testified a undisclosed assets about finding the undisclosed assets, including a description and the location. To the extent the undisclosed assets were not in the Defendant's name, the Trustee testified that they were in Defendant's home, or under Deendant's control and by various admissions or other facts appeared to be owned by the Defendant.

The Defendant filed a voluntary petition, which he signed under penalty of perjury. However, the Defendant failed to list any of the undisclosed assets on his schedules and SOFA despite testifying less than a month prior to his bankruptcy filing about the existence of some of them.  But, that was not all.  The Defendant then failed, on multiple occasions, to rectify these blatant errors and omissions, although given numerous opportunities to do so.  The Trustee testified that he made several requests for the Defendant to supply information regarding the Defendant's assets.  The Defendant chose to ignore the Trustee's requests.  The Defendant instead played a game of "catch me if you can."  The Trustee caught the Defendant, which was not difficult based on the Defendant's own prior testimony from a deposition that took place just prior to the Defendant filing bankruptcy.  In the May 20, 2019 deposition, the Defendant testified under oath that he owned life insurance policies and safe deposit boxes.  He also testified about other businesses, his salary, and money owed to him by his sister.  However, when the Trustee questioned the Defendant in his bankruptcy case, about the assets, the Defendant failed to disclose his ownership of the gold bars, the amount and extent of the cash, the jewelry, and other assets. The Trustee was forced to utilize the assistance of the Court by obtaining orders and the U.S. Marshals Service to seize the Defendant's undisclosed assets.  Based upon the scope and pattern of the Defendant's concealment, as well as the inferences drawn from the Defendant's failure to provide any explanation when repeatedly asked on direct examination at trial, the Court finds the Defendant clearly had the intent to hinder, delay, and defraud the Trustee, the Brother, and other creditors in this case.

### *Defendant's Discharge is Denied Under Section 727(a)(3)*

Section 727(a)(3) provides that the court shall grant a discharge unless:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books,

documents, records, and papers, from which the debtor's financial
condition or business transactions might be ascertained, unless such
act or failure to act was justified under all of the circumstances of
the case;

11 U.S.C. § 727(a)(3).

Section 727(a)(3) "requires debtors to maintain and preserve sufficient and accurate record-keeping so that creditors and the trustee may ascertain their financial history and business dealings." *In re Cowan*, No. 16-14758 (SLM), 2019 WL 5615968, at *10 (Bankr. D.N.J. Oct. 23, 2019) (Meisel, J.), *aff'd sub nom. Cowan v. Vara,* No. CV 19-20578 (SDW), 2020 WL 2840069 (D.N.J. June 1, 2020) (citing *In re Kennedy*, 566 B.R. 690, 715 (Bankr. D.N.J. 2017) (Papalia, J.)); *see also Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992). To prove a claim under section 727(a)(3), a plaintiff must show by a preponderance of the evidence that: "(1) the debtor failed to preserve adequate financial records; and (2) such failure makes it impossible to ascertain the debtor's financial condition." *Kennedy*, 556 B.R. at 715 (citing *In re French*, 499 F.3d 345, 354 (4th Cir. 2007)). Intent is irrelevant. *In re Carlbon*, No. 10-14413 (RTL), 2011 WL 6739507, at *5 (Bankr. D.N.J. Dec. 20, 2011) (Lyons, J.) (citing *In re Luby*, 438 B.R. 817, 830-33 (Bankr. E.D. Pa. 2010)). The only required showing "is that the debtor unjustifiably failed to keep records of his financial condition." *Grammenos*, 469 B.R. at 548-49 (quoting *Meridian Bank*, 958 F.2d at 1234).

Once the plaintiff demonstrates "a failure to maintain records, the burden shifts to the debtor, who then must justify his failure to the court's satisfaction." *Grammenos*, 469 B.R. at 549 (citing *Meridian Bank*, 958 F.2d at 1233). However, "[j]ustification is not articulated in the Bankruptcy Code; thus, the trier of fact must make a determination considering the case's circumstances." *Drossel*, 2009 WL 3230794, at *5 (citing *Meridian Bank*, 958 F.2d at 1231; *Yanni*, 354 B.R. at 715). Justification of the debtor's failure to maintain records "depends largely

21

on what a normal, reasonable person would do under similar circumstances." *Grammenos*, 469 B.R. at 549 (citations omitted).   The inquiry includes: "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice."   *Id.* (citing *Meridian Bank*, 958 F.2d at 1231). Where "a debtor is unsophisticated or lacks experience in financial recordkeeping, courts have set a lower threshold for justification." *Grammenos*, 469 B.R. at 549 (citing *Meridian Bank*, 958 F.2d at 1231) ("Obviously an unsophisticated wage earner dealing primarily in cash should not be denied a discharge because he failed to keep books of account.   A higher standard of care is required, however, for a merchant actively engaged in credit transactions.") (internal citation omitted)).

Debtors are not permitted to "avoid producing information regarding their financial history 'under cover of a chaotic or incomplete set of books or records.'" *Kennedy*, 566 B.R. at 717 (quoting *Meridian Bank*, 958 F.2d at 1230).   "Creditors have the right to receive sufficient information so that they can trace a debtor's financial transactions and should not be forced to 'speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs.'" *Kennedy*, 556 B.R. at 717 (quoting *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996)).   A debtor seeking protection under the Bankruptcy Code "must have records to qualify for a discharge." *Carlbon*, 2011 WL 6739507, at *7.   A discharge may not be granted without records.  *Id.* (citing *In re Prupis*, No. 04-48414 (RTL), 2007 WL 295351, at *1 (Bankr. D.N.J. Jan. 24, 2007) (Lyons, J.)).

To prove a claim under section 727(a)(3), a plaintiff must first show "the debtor failed to preserve adequate financial records." *Kennedy*, 556 B.R. at 715.   The Plaintiffs in the present case

meet that burden.  Here, the Brother established that the Defendant received $3.5 million from the sale of the real property owned by New Angle in 2014.  The Defendant failed to produce any records to account for the disposition of those monies.  First, the Brother presented evidence showing that the New York Supreme Court found, among other things: (1) the Defendant owed the Brother a significant amount of money from the sale of real estate; and (2) the Defendant failed to provide proper documentation regarding the sale.  That finding is entitled to collateral estoppel here.

"The doctrine of collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were adjudicated in a prior lawsuit, and applies in bankruptcy discharge proceedings." *In re Russo*, No. 15-24843 (SLM), 2019 WL 117469, at *13 (Bankr. D.N.J. Jan. 4, 2019) (Meisel, J.) (citing *Grogan v. Garner*, 498 U.S. at 284-285 n. 11; *In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997); *In re Aiello*, 660 F. App'x 179, 182 (3d Cir. 2016)) (further citations omitted).

The issue of proper documentation has been decided.  And even if that finding is not subject to collateral estoppel, the Brother provided testimony to support this Court reaching the same conclusion.  The Defendant failed to refute the Brother or produce documentation demonstrating otherwise.  Just like in the State Court Lawsuit, the Defendant produced no documentation regarding his financial records.  Further, the Trustee testified that he and his professionals requested documentation from the Defendant regarding his financial affairs, including the life insurance policies, bank accounts, leases, his interest in his mother's estate, and money owed to him.  Again, Defendant failed to produce anything.  To receive a discharge through bankruptcy, a debtor is obligated to disclose his financial situation to the appropriate authorities, and the Defendant failed to do so.  *Broad Nat'l Bank v. Kadison,* 26 B.R. 1015, 1018 (D.N.J. 1983).  The lack of reliable financial records leaves one needing to "speculate as to the financial history" of

the Defendant and requires a "reconstruction" of his financial condition, which is the exact situation section 727(a)(3) seeks to avoid. *Juzwiak*, 89 F.3d at 428; *In re Cowan*, 2019 WL 5615968, at *10. As a result, the Court concludes the Plaintiffs met their burden under section 727(a)(3).

The Court finds that the Plaintiffs met their initial burden of demonstrating that the Defendant failed to provide adequate records to show his financial situation. Now "the burden shifts to the Defendant to prove the lack of records was justified." *In re Cowan*, 2019 WL 5615968, at *13 (citing *Kennedy*, 556 B.R. at 717; *Meridian Bank*, 958 F.2d at 1233). The Court is bound to an objective standard—what a reasonable person might do under similar circumstances. *Meridian Bank*, 958 F.2d at 1231. The Court's review of reasonableness includes: the "education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice." *Grammenos*, 469 B.R. at 549 (citing *Meridian Bank*, 958 F.2d at 1231). However, none of those factors are relevant here because the Defendant failed to offer any justification whatsoever. The Defendant had many opportunities to defend himself and provide a justification as to why he failed to produce any financial records. The Defendant chose not to offer any justification. Instead, the Defendant decided to remain silent. Silence fails to meet the requisite standards. Instead, it works against the Defendant. The Court finds the Defendant failed to offer any justification as to why he failed to keep financial records.

The Plaintiffs have met their burden demonstrating the Defendant failed to provide adequate records and to justify the lack of records. Therefore, denial of the Defendant's discharge under § 727(a)(3) is appropriate.

### *Defendant's Discharge is Denied Under Section 727(a)(4)*

Section 727(a)(4) provides:

> (a) The court shall grant the debtor a discharge, unless—
>
> . . .
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>> (A) made a false oath or account;
>>
>> (B) presented or used a false claim;
>>
>> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
>>
>> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

11 U.S.C. § 727(a)(4).

Under section 727(a)(4), the Trustee must prove an actual intent of the Defendant to hinder, delay, and defraud creditors. *In re Georges*, 138 Fed. Appx. 471, 472 (3d Cir. 2005). "The elements of a claim under this section are: '(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.'" *In re Kennedy*, 566 B.R. at 720 (citing *In re Retz*, 606 F. 3d 1189, 1197 (9th Cir. 2010). "Signing the petition and certifying that the statements therein are true under penalty of perjury constitutes an oath under this section. A material omission can also be a false oath. Fraudulent intent can be inferred where no reasonable explanation for the omission is provided." *Kennedy*, 566 B.R. at 720 (citations omitted). The Defendant's intent to defraud creditors can be inferred from the Defendant's conduct. *Scimeca*, 169 B.R. at 542-43, *aff'd sub nom. In re Scimeca*, 30 F.3d 1488 (3d Cir. 1994).

As discussed, pre-petition the Defendant testified and identified multiple assets that he owned less than a month before he filed bankruptcy. For whatever reason, the Defendant chose not to list those assets on his schedules and SOFA. The Defendant did not volunteer any corrections to the petition and schedules until well after the assets were discovered through independent investigation conducted by the Trustee. Even then, the information supplied by the Defendant remained incomplete. "Reckless indifference to the truth is the functional equivalent of fraud for the purposes of denying a discharge to a debtor under § 727(a)(4)." *In re Elian*, 659 F. Appx 104, 106 (3d Cir. 2016) (citations omitted).

Bankruptcy should not be treated as a game of discovery—wherein creditors or fiduciaries must discover Debtor's assets. Debtors are required to disclose *all* of their assets and liabilities. It is the "honest" and unfortunate debtor that is entitled to a discharge. In the main case, the Defendant made a false oath when he signed his: (1) schedules that omitted multiple assets, including the cash, jewelry, gold bars, and the life insurance policies from New York Life and MetLife; and (2) SOFA that omitted the safe deposit boxes. The value of the undisclosed assets is significant, making the omissions material. Clearly the Defendant knew he owned cash, jewelry, gold bars, and the life insurance policies and safe deposit boxes at the May 20, 2019 deposition, some of which he disclosed then and some he did not. For those Defendant disclosed in May 2019, Defendant certainly did not forget by the time he filed bankruptcy less than a month later. This Court finds the Defendant knowingly omitted the undisclosed assets from his schedules and SOFA. The Defendant made a false oath when he signed his petition, schedules, and SOFA under penalty of perjury. The Court finds denial of the Defendant's discharge pursuant to section 727(a)(4) is warranted.

**B.**      *Section 523(a)(4)*

A denial of discharge under any provision of section 727 is a blanket denial of a debtor's discharge and benefits all creditors.  Therefore, the Court need not conduct an analysis of an exception to discharge under section 523(a)(4), which only excepts the debt owed to a specific creditor.

**C.**      *Whether the* **Seized** *Assets Are Property of the Estate*

Another issue before the Court is whether the assets recovered from the Residence, safe deposit boxes, and insurance proceeds are property of the estate.  The Trustee concedes that some of the assets belong to the Defendant Kimberly and are not property of the estate.  The Trustee agrees the assets are jointly owned except for one safe deposit box (located at TD Bank containing $5,200.00), which was solely in the Defendant's name.  The Trustee also concedes a life insurance check from MetLife, which was held by Olivia Amelia Ngo is also not an estate asset.

The Trustee bears the burden of proof to show the property at issue is an asset of the estate. *In re High Sierra Transp., Inc.,* 101 B.R. 432, 434 (Bankr. M.D. Pa. 1989).  The Trustee must demonstrate that: "1) during the case; 2) an entity other than a custodian; 3) was in possession, custody, or control; 4) of property that the trustee could use, sell or lease; and 5) that such property is not of inconsequential value or benefit to the estate." *In re U.S.A. Diversified Prods., Inc.,* 193 B.R. 868, 872 (Bankr. N.D. Ind. 1995), *aff'd,* 196 B.R. 801 (N.D. Ind. 1996), *aff'd sub nom. In re USA Diversified Prods., Inc.*, 100 F.3d 53 (7th Cir. 1996).  The Trustee must establish his burden by a preponderance of evidence. *In re Patton*, 200 B.R. 172, 174 (Bankr. N.D. Ohio 1996); *but see In re Robertson*, 115 B.R. 613, 620 (Bankr. N.D. Ill. 1990) (holding that the standard of proof is by clear and convincing evidence).  The Court could apply either standard, and the Trustee still proves successful.

The Amended Complaint contends all or part of the assets are property of the estate. Neither the Defendant nor Defendant Kimberly filed responsive pleadings to the Amended Complaint. Accordingly, the allegations in the Amended Complaint are deemed admitted. Fed. R. Civ. P. 8(b)(6). The Defendant could have contested the assertions in the Amended Complaint, but the Defendant failed to do so. Instead, the Defendant acquiesced. It is only natural under the circumstances for one to object to the assertions in the Amended Complaint if those allegations are false. *See United States v. Hale*, 422 U.S. 171, 176 (1975). "Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character*." U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923). Here, the Defendant's silence is very persuasive, but not for the Defendant.

The Court acknowledges that at one point both the Defendant and Defendant Kimberly submitted certifications. However, the Defendants' certifications are the only submissions to the Court throughout the entire course of the adversary proceedings that set forth the Defendants' contentions about their ownership of the assets. *See Defendant Kimberly's Certification, Trustee's Exhibit 3*, T00022-T00026*; Defendant's Certification, Trustee's Exhibit 2*, T00014-T00021. Procedurally, the certifications failed to qualify as a response to the Amended Complaint because they were filed well before the Amended Complaint. The Defendant and Defendant Kimberly cannot respond to something that does not exist at the time of the certifications. The Amended Complaint is dated April 9, 2020. *Adv. Pro. No. 19-02161*, ECF No. 20. The certifications were filed in another one of the adversary proceedings on October 3, 2019. *Adv. Pro. No. 19-02145*, ECF Nos. 3 and 4. Defendant Kimberly did not testify at trial nor present proofs. The Court previously entered default against Defendant Kimberly. The Defendant, however, still had every

available opportunity to testify during the trial regarding the seized assets. He chose not to do so and remained silent in the face of the evidence presented.

While the certifications are non-responsive pleadings, as a Court of equity, the Court reviewed the certifications. The Court notes that Defendant Kimberly's Certification contains questionable information. A careful review shows that Defendant Kimberly's Certification does not accurately identify the amount or location of the funds recovered by the Trustee from the Residence, nor does she identify, by either amount or value, the gold bars the Trustee recovered, some of which she claims to own. *See Defendant Kimberly's Certification, Trustee's Exhibit 3*, T00022-T00026. Further, Defendant Kimberly's Certification speaks generally of women's jewelry and identifies only a handful of pieces of jewelry as belonging specifically to her. *Id.* Defendant Kimberly's Certification contains statements, which cannot be taken as true in light of the testimony presented by the Trustee. *Id.* Paragraph 10 of Defendant Kimberly's Certification provides "[a]s far as I am aware, we were struggling financially and have no money which resulted in Chivy Ngo's filing for bankruptcy." *Id.* at T00023. Defendant Kimberly's statement is inconsistent with the fact that the Trustee discovered a file cabinet containing over $100,000.00 in gold and jewelry and another $150,000.00 cash in a box located in the walk-in closet in the residence. *Id.* at T00022-T00026; *see also Trustee's Exhibit 1*, T000013. In Paragraph 14, Defendant Kimberly further provides that she would save money and put it all over the house for safekeeping. *Defendant Kimberly's Certification, Trustee's Exhibit 3*, T00023. Additionally, in Paragraph 18, Defendant Kimberly indicated that she would attempt to put the money in very secure locations throughout the house. *Id.* at T00024. Contrary to Defendant Kimberly's assertions, the only money recovered at the residence was either located in the basement or master bedroom, primarily in a box in the walk-in closet. *See Trustee's Exhibit 1*, T000013. Defendant

Kimberly's Certification also contains other inconsistencies.  For instance, Paragraph 14 provides that Defendant Kimberly put money away for safe keeping because someone previously broke into the Residence.  *Defendant Kimberly's Certification, Trustee's Exhibit 3*, T00023.  On the other hand, in Paragraph 15, Defendant Kimberly states she never expected someone to intrude into the home and conduct a search of the type done when the Trustee conducted the seizure.  *Id*. at T00024.  Additionally, in Paragraph 21, Defendant Kimberly states she always felt her home was a secure place to store her money.  *Id*.  When read together, Defendant Kimberly's Certification is simply a litany of inconsistent statements seemingly designed for each to stand alone instead of being read together as a whole.  Based upon the evidence presented, the statements in *Defendant Kimberly's Certification* lack credibility.

"As a general rule, proof of the possession of personal property is prima facie evidence of title or is said to raise a presumption of ownership, which may be rebutted or overcome by evidence of ownership in another."  29 Am. Jur. 2d Evidence § 284.  Both the Defendant and Defendant Kimberly failed to submit any credible evidence regarding the ownership of any particular items.  Therefore, the Court finds the Defendants share in the ownership equally except for any items specifically held individually and so named.

The two Appraisal Reports summarize the total appraised assets to be worth $167,387.00.  The Trustee proposes to retain the items, which he deems will be most efficient to liquidate.  He proposes to return the remaining items to Defendant Kimberly.  In other words, the Trustee will divide the assets by value, liquidating the easiest ones.  The Court finds this request reasonable.  The Trustee proposes to utilize the value as set forth in the two Appraisal Reports submitted into evidence.  *Trustee's Exhibits 4 & 5,* T00027-T00070; *see also Plaintiff's Proposed Finding of Fact and Conclusions of Law to Support Determination that Recovered Assets are Property of the*

*Estate*, *Adv. Pro. No. 19-02161*, ECF No. 46.  The following breakdown are the items to be retained

by the estate that were itemized and the appraisal reports:

- Asset 1 - Credit Suisse One Ounce Fine Gold Bars, value totaling $31,050.00,

- Asset 2 - Yellow Gold Link Bracelet, value totaling $1,550.00,

- Asset 5 - Assorted Yellow Gold Chains w/Pendants, value totaling $15,000.00,

- Asset 7 - Assorted Yellow Gold Rings, value totaling $1,440.00,

- Asset 8 - Assorted Yellow Gold Rings, value totaling $1,066.00,

- Asset 10 - Assorted Yellow Gold Rings, value totaling $817.00, and

- Asset 1A (Second Appraisal Report) - Credit Suisse One Ounce Fine Gold Bars, value
  totaling $32,850.00.

*Trustee's Exhibits 4 & 5*, T00045 & T00066.

These assets have a total value of $83,773.00.  The remaining assets have a value of

$83,614.00.  One half of the difference between these allocations, which is $79.50, should be added

to the allocation of cash to Defendant Kimberly.  Further, the cash from the house and from the

East West Bank safe deposit box totals $174,559.33.  The foreign currency totals $1,010.67.  The

Court agrees with the Trustee that the foreign currency shall be returned to Defendant Kimberly

and the Trustee shall receive a credit for half of its value.  The cash from the TD Bank safe deposit

box totaling $5,200.00 shall not be split with Defendant Kimberly because that safe deposit box

was in the Defendant's name alone. Lastly, the Trustee previously paid Defendant Kimberly the

sum of $50,000.00 pursuant to the *Consent Order Regarding Seized Funds* entered October 7,

2019 and the *Second Consent Order Regarding Seized Funds* entered on November 25, 2020.

*Main Bankruptcy Case*, ECF Nos. 24 and 81.  The consent orders provide that the funds paid to

Defendant Kimberly are to be applied to Defendant Kimberly's interest in the assets and/or the

Defendant's exemption.  The seized assets that are now determined to belong to Defendant Kimberly should be reduced by the $50,000.00 already paid to her.  In other words, a reduction of $50,000.00 shall be credited to the Estate's column and subtracted from Defendant Kimberly.

## CONCLUSION

Based on the foregoing, this Court finds that the Plaintiffs have met their burden to show that discharge should be denied under sections 727(a)(2), (3) and (4).  The Court adopts the Trustee's recommendation for the division of the assets.  The Trustee shall submit an order that memorializes the Opinion.

**DATED: August 13, 2021**

_Stacey L. Meisel_
Honorable Stacey L. Meisel
United States Bankruptcy Judge